**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

MICHAEL VILLAVICENCIO,

             Plaintiff,

     v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

             Defendant.

Case No. 1:15-cv-00082-SMS

ORDER AFFIRMING AGENCY'S DENIAL
OF BENEFITS AND ORDERING
JUDGMENT FOR COMMISSIONER

      Plaintiff Michael Villavicencio seeks review of a final decision of the Commissioner of

Social Security ("Commissioner") denying his application for supplemental security income ("SSI")

under Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) ("the Act").  The matter is

before the Court on the parties' cross-briefs, which were submitted without oral argument to the

Magistrate Judge.  Following a review of the record and applicable law, the Court affirms the

decision of the Administrative Law Judge ("ALJ").

            I.  PROCEDURAL HISTORY AND FACTUAL BACKGROUND[1]

  A.  *Procedural History*

      Plaintiff applied for SSI on January 10, 2011.  The Commissioner denied Plaintiff's claim on

September 27, 2011, and upon reconsideration on May 2, 2012.  AR 68, 72.  At a hearing on March

_____

[1]  The relevant facts herein are taken from the Administrative Record ("AR").

15, 2013, before ALJ G. Ross Wheatley, Plaintiff appeared with counsel.  Also at the hearing was an impartial vocational expert ("VE").  AR 31.  Thereafter, on May 17, 2013, the ALJ issued a written decision finding Plaintiff not disabled under the Act.  AR 23.  On November 20, 2014, the Appeals Council denied review of the ALJ's decision, which thus became the Commissioner's final decision, and from which Plaintiff filed a timely complaint.  AR 1, Doc. 1.

B.  *Factual Background*

1.  Written Testimony

Plaintiff alleged the following conditions limited his ability to work: depression, left leg and foot pain, and low back disc problems.  His medications included Gabapentin, Methadone, Oxycontin, Prozac, Soma, and Xanax.  He completed one year of college and last worked in 2007 as an extradition agent, a job he held for three years.  AR 157-164.

A typical day for Plaintiff consisted of lying in bed for about an hour and a half "until [the] medication kick[]s in," getting up to do stretches, eat breakfast, watch television with his daughter, make her lunch, give her a bath, watch more television, wait for his mother to come home, eat dinner, take medications, and go to bed.  He had no problems with personal care, and could prepare food on a daily basis.  As for house and yard work, Plaintiff could do some ironing, but was unable to lift or bend over.  He went to church twice a week, but did not drive.  He could not walk more than half a block, and needed to rest for ten minutes thereafter.  He could pay attention for fifteen minutes and follow written and oral instructions, but did not handle stress or changes in daily routine well.  He used a cane at least three days a month.  Despite two back operations, Plaintiff still experienced constant pain in his left leg.  AR 166-173.

Plaintiff's mother completed a Third Party Function Report which generally paralleled Plaintiff's assertions regarding his conditions and activities of daily living.  There were, however, some differences.  She noted Plaintiff folded laundry, swept the house, watered the grass and flowers, and did these chores three times a week.  He could walk one block and used his cane about

once or twice month only when his back pain worsened.  AR 174-181.

Plaintiff reported that in June 2011, he began losing "most nerve response" in his left foot and ankle, and had trouble walking without falling.  He lost "much feeling in [the] left foot" and was depressed.  He had gained thirty pounds since January 2011 because he could not walk much. Plaintiff struggled to get dressed, put on socks or shoes, climb into a car, and was in constant pain. His medications caused sleepiness and dizziness.  AR 197-202.  By February 2012, Plaintiff's left ankle and foot had become weaker.  He could not walk or stand for more than fifteen minutes at a time, and has since developed pain in the right and left shoulders, upper back, and neck.  AR 205-210.

2.  Medical Evidence

The bulk of Plaintiff's medical records come from Kaiser Permanente Medical Group, through which Plaintiff received physiological and psychological care at locations including Sacramento, Modesto, and Stockton.   The records cover a three-year period from March 2010 to February 2013.  They show that in 2010, Plaintiff was admitted to Kaiser on numerous occasions with complaints of one or more of the following: low back, hip and leg pain; left leg numbness; gastrointestinal bleeding; blood in stool; urinary incontinence; abdominal pain; nausea; vomiting, diarrhea; scrotal pain; anxiety disorder; depression; hallucinations; and sleep issues.  Being a stay-at-home dad, while his wife worked, and finances were stressors.  AR 310-613, 677-703, 1063.

In May 2010, Plaintiff underwent surgery to redo a left L4-L5 laminotomy and microdiskectomy performed ten months earlier.  AR 421.  The surgeries did not bring Plaintiff complete relief as he still complained of pain and hip problems, and required a Dilaudid injection to address the pain.  AR 445, 448.  In the same month, he was admitted with alcohol abuse and overdose.  Plaintiff's wife reported he had consumed ninety pills of Percocet and ninety pills of Valium, had been depressed recently with talk of cutting his leg off due to the pain, and that he has a history of overdose and suicide ideation.  Plaintiff denied trying to hurt himself.  He was discharged

the same day. AR 461-463. In August and September 2010, Plaintiff reported the left leg felt a little better than before surgery, the hip and low back were well under control with medications, and the left foot pain before surgery was resolved. He was, however, suffering mid-back pain above the lumbar spine. AR 542, 639. And in November 2010, Plaintiff reported overall pain decreasing and that he was "able to do . . . everyday things without pain." AR 813.

Plaintiff's chief complaint throughout 2011 was low back pain, for which he received chronic pain management consisting of medications and epidural injections. AR 838-1033. In May 2011, he reported going to school and taking business courses. His back pain had improved, but left lower extremity pain still persisted. AR 1040, 1063. During a physical examination, the attending physician noted no abnormal pain behavior. AR 1091. Sonja Terry Van Laar, Ph.D., diagnosed Plaintiff with general anxiety disorder, obsessive compulsive disorder ("OCD"), and dysthymia. Plaintiff would participate in a chronic pain management group and make individual health psychology visits with Dr. Van Laar. AR 1055.

In the same month, Tania Shertock, Ph.D., completed a psychological evaluation of Plaintiff at the request of the Department of Social Services. He complained of low back and right shoulder injury; low back disc problems; left leg and foot pain; left toe numbness; depression; diverticulitis; and high blood pressure. He reported a history of psychiatric hospitalizations in 2008 after a suicide attempt for which he was admitted under California Welfare and Institutions Code 5150,[2] a family

---

[2]  Section 5150 states, in relevant part:

> When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff . . . of an evaluation facility designated by the county, designated members of a mobile crisis team provided by Section 5651.7, or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation.

Cal. Welf. & Inst. Code § 5150 (2011).

4

history of mental illness, and being sexually abused as a child.  His mental status examination was overall unremarkable and generally normal aside from endorsing current auditory hallucinations and illusions, though he did not appear internally preoccupied.  Dr. Shertock opined that Plaintiff functioned in the average range and further predicted he would: (1) have no problems interacting with others; (2) be unable to maintain consistent concentration, persistence and pace (moderately impaired) due to severe pain; (3) be able to perform simple repetitive tasks but not in a sustained manner; (4) be unable to perform detailed and complex tasks; (5) have difficulty adapting to work stress and changes; (6) have difficulty maintaining a consistent schedule; and (7) not pose a safety hazard to himself or others.  Dr. Shertock diagnosed Plaintiff with alcohol dependence, major depressive disorder with psychotic features, anxiety disorder due to a general medical condition, and assigned him a GAF[3] of 50. AR 802-805.

In June 2011, Plaintiff reported getting more sleep at nights as muscle spasms were under control.  AR 1076.  But in the same month, he experienced panic attack symptoms upon learning that his mom was diagnosed with terminal lung cancer.  AR 1082.  She lived with Plaintiff and remained under his care.  AR 1088.  The next month, Plaintiff reported walking to classes, using a TENS unit in class, being able to put on his socks and shoes, and exercising daily at home by stretching and walking a quarter mile.  AR 1111.  Records show Plaintiff missed two appointments with Dr. Van Laar that month.  AR 1102-1104,

In August 2011, he informed a nurse that he "made a lot of progress" through his meetings with Dr. Van Laar.  Also, his pain had been under control for the past thirty days.  AR 1229.  He attended two chronic pain management classes, but missed two classes due to a fall which injured his right knee.  AR 1120-1126, 1146, 1182.  He reported limited exercise consisting of using the

---

[3] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment.  According to the DSM–IV, a GAF score between 41 and 50 describes serious symptoms or any serious impairment in social, occupational, or school functioning." *Garrison v. Colvin*, 759 F.3d 995, 1003 (9th Cir. 2014).

treadmill for fifteen minutes, twice a week, before the fall.  AR 1163, 1269.  On one occasion, the attending nurse observed Plaintiff walk out of the emergency department with a steady gait.  AR 1162.  Dr. Van Laar found mental status was normal.  AR 1270.  In September 2011, E. Aquino-Caro, M.D., completed a psychiatric review and mental RFC assessment of Plaintiff.  Dr. Aquino-Caro concluded Plaintiff had an affective disorder, dysthymia, and an anxiety disorder.  Functionally, his ability to understand, remember and carry out detailed instructions was moderately limited.  AR 1193-1206.  In December 2011, Plaintiff's primary physician, Surekha Bavirti, M.D., discussed with Plaintiff her assessment of his conditions, which included severe obesity, chronic pain syndrome, and hypertension.  She noted Plaintiff's abuse history with medications and asked him to make a serious attempt to improve his diet and exercise to aid in the management of his health problems.  AR 1391.

Kaiser records from 2012 generally show Plaintiff engaged in more physical activities.  On numerous occasions, he reported using an elliptical machine multiple times a week, walking for a mile almost daily with his dogs, managing his sons' baseball team and his daughter's softball team, and getting out of the house Monday through Friday.  AR 1438-1487.  Plaintiff and his wife took their four children to Disneyland.  AR 1460.  He did "more home improvement projects and [went] shopping at Home Depot, Loew's, OHS, etc. [w]ithout excessive paranoia and anxiety."  AR 1488.  He went grocery shopping and did household errands, going out four to five times daily, and handling anxiety well.  AR 1634.  He was also stable on medications for several months.  AR 1645.  Plaintiff completed the chronic pain management program in June 2012.  AR 1644.  In December 2012, Plaintiff reported acute lower back pain "while in the process of changing the oil for his car."  AR 1689.

In January 2013, Frank Fine, M.D., completed a physical RFC questionnaire, a check-the-box and fill-in-the-blank form, of Plaintiff.  Dr. Fine opined Plaintiff could not perform simple work tasks due to constant pain and the severity of his symptoms, and was incapable of low stress jobs.

Additionally, Plaintiff suffered depression and anxiety.  He could walk for no more than half a block without rest, and sit and stand for no more than fifteen minutes each at a time.  In an eight-hour workday, he could sit and stand/walk for less than two hours total and required ten-minute walks every thirty minutes; needs to take unscheduled breaks; occasionally uses a cane or assistive device to stand/walk; rarely lift and then only under ten pounds; rarely perform postural activities; has significant limitations with reaching, handling or fingering; would be absent more than four days per month; and required a job that permits a sit/stand/walk option.

In a separate written report, Dr. Fine documented his examination of Plaintiff.  Physically, Plaintiff had limited range of motion of the spine and right shoulder.  Dr. Fine noted "signs of disuse atrophy in the left lower extremity."  Dr. Fine opined Plaintiff should avoid pushing, pulling or lifting more than ten pounds with his upper extremities; could not use his arm at or above shoulder height;[4] limited to repeated bending and stooping at the waist; could not stand for more than 30 minutes at a time and needed a five to ten minute interval rest; could not walk over uneven ground; could not perform pivoting maneuvers with his left extremity; and could not climb stairs or ladders. Dr. Fine expressed doubt about Plaintiff's ability to return to the workforce and concluded his restrictions were permanent.  AR 1506-1514.

In March 2013, Joseph Hernandez, Ph.D., completed a psychological assessment of Plaintiff, who denied having suicidal ideation and was not considered a suicide risk.  Plaintiff reported feeling somewhat sad, discouraged, agitated, losing interest in people and things, loss of energy, indecisive, self-critical, irritable, changes in sleep and appetite, and feeling worthless compared to others.  He also reported "significant difficulties with concentration, being extremely fatigued, and having diminished libidinal interests."  Test results revealed no cognitive or intellectual decrements, no present loss of contact with reality, and no formal thought disorder.  Dr. Hernandez found Plaintiff presented in a severely depressed and significantly anxious manner.

---

[4]  Dr. Fine did not specify which arm could not be used at or above shoulder height.  AR 1513.

Dr. Hernandez opined Plaintiff had severe depressive and anxiety symptoms and met the criteria of anxiety disorder not otherwise specified and dysthymic disorder.  A GAF score of 50 was deemed appropriate.  Dr. Hernandez stated, "the most appropriate diagnosis at this time appears to be a Pain Disorder Associated With Both Psychological Factors and a General Medical Condition." He concluded Plaintiff's affective conditions made it difficult for him to focus and concentrate, and therefore would interrupt his usual work schedule.

Dr. Hernandez also completed three questionnaires, all check-the-box and fill-in-the-blank forms on the same day.  He generally provided the same evaluation in all three questionnaires except that in one of the questionnaire, he concluded Plaintiff's ability to deal with normal work stress and the stress of semiskilled and skilled work would be precluded by as much as ten percent in an eight-hour workday.  This was in contrast to the two other questionnaires wherein he indicated Plaintiff's ability to respond appropriately to changes in the work setting would be precluded by only as much as five percent in an eight-hour workday.  AR 1516-1526.

3.  <u>Hearing Before ALJ</u>

At the time of the hearing, Plaintiff was thirty-seven years old at a height of five feet nine inches and weighed 265 pounds.  He had four children, aged five, twelve, thirteen, and fourteen.  He explained that increased pain in his low back and legs caused him to stop working, as the job of extradition agent required a lot of driving.

Plaintiff testified feeling pain in his low back and left hip area which radiated down the left leg and foot.  Gabapentin and Methadone provided relief from his conditions, as did the two spinal surgeries.  The course of physical therapy after his second surgery, however, did not provide much benefit.  Plaintiff's left leg radiculopathy was triggered at least once a month.  Plaintiff also had two right shoulder surgeries.  Unlike the right arm, he had no issues with the left arm.  He could stand for a long time if necessary, sit between fifteen to twenty-five minutes at a time and lift a gallon of milk with either arm.  He stopped using the elliptical machine in 2012 due to the left leg pain which

8

caused him to trip.  He could dress himself, but had trouble putting on socks and shoes.  He attended church once a week and drove once in a while, the longest distance being fifteen miles.  With regard to his depression, Plaintiff testified he stopped taking medications in 2008.  He did not feel comfortable leaving the house, although he attended his children's baseball games twice a week. Plaintiff admitted to using alcohol to self-medicate and did so before the second spinal surgery, but has stopped drinking since 2010.  He had abused prescription drugs but has since completed a rehabilitation program.

When questioned by his counsel, Plaintiff testified to a suicidal attempt in 2010 where he was hospitalized after consuming  a large amount of mediations and alcohol.  He was placed on hold for forty-eight hours.  AR 36-59.

The VE, Stephen Schmidt, also testified.  He classified Plaintiff's past work as a guard deputy, sales representative in printing, television installer, and compression machine tender.  The VE responded to a number of hypotheticals based on a person of Plaintiff's age, education and work experience, given the ALJ's RFC findings.  AR 61-65.

4.  ALJ's Decision

A claimant is disabled under Title XVI if she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of no less than twelve months.  42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a).  To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process which an ALJ must employ to evaluate an alleged disability.[5]

---

[5]  "In brief, the ALJ considers whether a claimant is disabled by determining: (1) whether the claimant is doing substantial gainful activity; (2) whether the claimant has a severe medically determinable physical or mental impairment or combination of impairments that has lasted for more than 12 months; (3) whether the impairment meets or equals one of the listings in the regulations; (4) whether, given the claimant's residual functional capacity, the claimant can still do his or her past relevant work; and (5) whether the claimant can make an adjustment to other work. The claimant

Here, the ALJ found that at step one, Plaintiff had not engaged in substantial gainful activity since the application date of January 10, 2011.  At step two, Plaintiff had the following severe impairments: obesity, chronic pain syndrome, and disorders of the spine, namely degenerative joint disease degenerative disc disease status post two lumbar spine surgeries with residual chronic low back pain.  At step three, Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Plaintiff had the residual functional capacity (RFC) to lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for four hours total in an eight-hour workday; and sit for six hours in an eight-hour workday.  He could occasionally balance, stoop, kneel, crouch, crawl, and climb stairs and ramps, but never climb ladders, ropes, and scaffolds.  At step four, Plaintiff could not perform any past relevant work.  Finally, at step five, the ALJ found there were jobs in the national economy existing in significant numbers which Plaintiff could perform, considering his age, education, work experience and RFC.  Because Plaintiff could perform more than the full exertional requirements of sedentary work based on his RFC, and that postural limitations had little or no effect on the occupational base of unskilled sedentary work, the ALJ relied on Rule 201.28 of the Medical-Vocational Guidelines to find Plaintiff was not disabled.  Consequently, the ALJ concluded Plaintiff was not disabled as defined under the Act since January 10, 2011.  AR 13-25.

## II.  DISCUSSION

A. *Legal Standards*

This Court reviews the Commissioner's final decision to determine if the findings are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 401 (1971)), but "less than a preponderance." *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.

bears the burden of proof at steps one through four."  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).

10

"If the evidence can reasonably support either affirming or reversing a decision, we may not substitute our judgment for that of the Commissioner.  However, we must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal citation and quotations omitted).  "If the evidence can support either outcome, the Commissioner's decision must be upheld."  *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003); *see* 42 U.S.C. § 405(g) (2010).  But even if supported by substantial evidence, a decision may be set aside for legal error. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).

Moreover, an ALJ's error is harmless "when it was clear from the record that [the] error was inconsequential to the ultimate nondisability determination."  *Robbins v. Soc. Sec. Admin*. 466 F.3d 880, 885 (9th Cir. 2006).

B.  *Analysis*

Plaintiff contends the ALJ erred in: (1) dismissing Plaintiff's pain testimony, (2) not finding that Plaintiff's mental impairments were severe, and (3) his RFC determination.

1.  Plaintiff's Pain Testimony

Plaintiff avers the finding that his pain testimony was not entirely credible does not comport with Social Security ruling 96-7p and case law, and is unsupported by evidence in the record.  Doc. 18.  The Commissioner asserts the ALJ properly discounted Plaintiff's allegations of disabling physical and mental symptoms.  Doc. 19.

A claimant's statement of pain or other symptoms, without more, is not conclusive evidence of disability.  20 C.F.R. § 416.929(a).  Rather, "[a]n ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."

11

*Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quotations omitted).  "If the claimant

satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the

claimant's testimony about the severity of her symptoms only by offering specific, clear and

convincing reasons for doing so.  *Id.* at 1014-15; *see Robbins,* 466 F.3d at 883 ("[U]nless an ALJ

makes a finding of malingering based on affirmative evidence thereof, he or she may only find an

applicant not credible by making specific findings as to credibility and stating clear and convincing

reasons for each."); SSR 96-7p (ALJ's decision "must be sufficiently specific to make clear to the

individual and to any subsequent reviewers the weight the adjudicator gave to the individual's

statements and reasons for that weight.").  Factors an ALJ may consider include: "(1) ordinary

techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent

statements concerning the symptoms, and other testimony by the claimant that appears less than

candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed

course of treatment; and (3) the claimant's daily activities."  *Smolen v. Chater*, 80 F.3d 1273, 1284

(9th Cir. 1996).  The ALJ must also give consideration to the factors enumerated in SSR 96-7p.[6]

"It's not sufficient for the ALJ to make only general findings; he must state which pain testimony is

---

[6]  Social Security Ruling 96-7p states, in relevant part:

> In recognition of the fact that an individual's symptoms can sometimes suggest a
> greater level of severity of impairment than can be shown by the objective medical
> evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence,
> including the factors below, that the adjudicator must consider in addition to the
> objective medical evidence when assessing the credibility of an individual's
> statements:

> 1.  The individual's daily activities;

> 2.  The location, duration, frequency, and intensity of the individual's
>     pain or other symptoms;

> 3.  Factors that precipitate and aggravate the symptoms;

> 4.  The type, dosage, effectiveness, and side effects of any medication the
>     individual takes or has taken to alleviate pain or other symptoms;

> 5.  Treatment, other than medication, the individual receives or has
>     received for relief of pain or other symptoms;

1    not credible and what evidence suggests the complaints are not credible.  He must either accept

2    [claimant's] testimony or make specific findings rejecting it." *Dodrill v. Shalala*, 12 F.3d 915, 918

3    (9th Cir. 1993) (citation and quotations omitted).

4            Before making his finding on credibility, the ALJ summarized Plaintiff's complaints as

5    follows:

6
                He complains of a constant burning pain in the left low back and hip,
7               going all the way down the left leg.  He also complains of decreased
                sensation in his left buttock, left posterior thigh, and three toes of the
8               left foot.   Occasionally, his left foot drags when he walks . . . .
                Additionally, the claimant testified that he has depression that limits
9               him[.]

10   AR 18-19.  The ALJ then found Plaintiff's medically determinable impairments reasonably caused

11   the alleged symptoms.  As to the statements concerning the pain symptoms' intensity, persistence,

12   and limiting effects, however, the ALJ found Plaintiff not entirely credible.  Specifically, he

13   questioned the limiting effects of Plaintiff's "musculoskeletal impairments."  And because no

14   evidence suggested Plaintiff was malingering, the ALJ was required to provide clear and convincing

15   reasons for rejecting Plaintiff's statements.

16

17           Here, the ALJ discussed multiple reasons for finding Plaintiff not entirely credible.  They

18   included Plaintiff's described daily activities, his report of effective medical treatment, and the

19   ALJ's personal observation.  These reasons find substantial support in the record and are grounded

20   in law.  First, the ALJ recounted Plaintiff's reports of being a stay-at-home Dad and caring for his

21   youngest child, coaching his children's sports teams, caring for his terminally ill mother, shopping,

22   performing home improvements, walking his dogs, performing aerobic exercise, changing the oil in

23   his car, and taking his children to Disneyland.  From these, the ALJ could reasonably infer that

24

25   ───────────────────────────────────────────────

26        6.  Any measures other than treatment the individual uses or has used to
               relieve pain or other symptoms (e.g., lying flat on his or her back,
27             standing for 15 to 20 minutes every hour, or sleeping on a board); and

28        7.  Any other factors concerning the individual's functional limitations
               and restrictions due to pain or other symptoms.

     SSR 96-7p (superseded by SSR 16-3p effective March 28, 2016).

Plaintiff's daily activities belie his claim of constant pain. *See Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (stating that "the two grounds for using daily activities to form the basis of an adverse credibility determination" are that they "contradict" the claimant's testimony and "do not meet the threshold for transferable work skills") (citations omitted).

Second, the ALJ noted that Plaintiff's substantial medical treatment was "largely . . . effective at controlling his pain." AR 21.  The ALJ recounted Plaintiff's report of walking to class on campus, report of his pain being well controlled with medications, and the completion of a pain management program with significant gains.  Indeed, they are substantially supported by the record and the ALJ was within reason to infer that such evidence undermined  Plaintiff's credibility. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008) (concluding the ALJ could permissibly infer that the plaintiff's "pain was not as all-disabling" where, among other, he responded favorably to conservative treatment).

Finally, the ALJ noted that contrary to Plaintiff's testimony that he could sit for only fifteen to twenty minutes at a time, he sat through the hearing, which lasted forty-two minutes.  This raised further doubt about Plaintiff's credibility. *See id.* ("an ALJ's personal observations may be used only in the overall evaluation of the credibility of the individual's statements") (internal quotations omitted); *see also Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) ("The inclusion of the ALJ's personal observations does not render the decision improper.") (quotations omitted).

The ALJ therefore provided specific, clear, and convincing reasons in finding Plaintiff not entirely credible.

### 2.   Mental impairments

Plaintiff contends the ALJ erred in failing to find the mental impairments severe given

the opinions of Drs. Shertock and Hernandez, and the Kaiser treatment records of Plaintiff's suicide

attempt.  The Commissioner asserts Plaintiff's contention is moot as the ALJ engaged in a proper

analysis at step two and "found that Plaintiff satisfied the severity requirement[.]"  And, moreover,

substantial evidence supported the ALJ's findings.  Doc. 19.

Social Security ruling 86-8 provides in relevant part:

> When assessing the severity of multiple impairments, the adjudicator
> must evaluate the combined impact of those impairments on an
> individual's ability to function, rather than assess separately the
> contribution of each impairment to the restriction of function as if each
> impairment existed alone. When multiple impairments, considered in
> combination, would have more than a minimal effect on the ability to
> perform basic work activities, adjudication must continue through the
> sequential evaluation process.

SSR 86-8.  And "[a]n impairment is not severe if it is a slight abnormality or a combination of slight

abnormalities which would have no more than a minimal effect on the individual's physical or

mental ability(ies) to perform basic work activities."  *Id.*; *see* 20 C.F.R. § 416.921("An impairment

or combination of impairments is not severe if it does not significantly limit your physical or mental

ability to do basic work activities.").

As noted, the ALJ concluded at step two that Plaintiff's obesity, chronic pain syndrome, and

disorders of the spine were severe.  The ALJ found "these impairments, individually, or in

combination, have more than a minimal effect on [his] ability to perform work related functions."

AR 13.  What he found to be non-severe were Plaintiff's: gastritis, appendicitis, bilateral shoulder

disorder, depression, anxiety disorder, and OCD.  With regard to the mental impairments, the ALJ

reasoned as follows:

> The claimant's medically determinable mental impairments of
> depression, generalized anxiety disorder, and Obsessive Compulsive
> Disorder (OCD), considered singly and in combination, do not cause
> more than minimal imitation in the claimant's ability to perform basic
> mental work activities and are therefore non-severe.

> The medical record shows that the claimant has had little treatment for
> mental disorders and has consistently refused antidepressant
> medication[.]   At the hearing he testified that he stopped taking

15

antidepressant medication in 2008.   There was an episode in May 2010, when the claimant overdosed on painkillers while drinking and was taken to an emergency room by his wife.   In a psychological consult the following day, the claimant denied being suicidal and indicated he merely over consumed alcohol to relieve pain.   Despite the Claimant's testimony at the Hearing that this was a suicide attempt and he was involuntarily held for two days, he was not held for observation, nor did he seek treatment afterwards[.]

The claimant did receive cognitive behavioral therapy between May 2011 and February 2012, mainly for OCD and anxiety.   He missed almost as many appointments as he attended.   Nevertheless, his symptoms responded quickly to treatment, and at a final session with his psychologist in April 2012 was noted to have no more than mild symptoms[.]   As the claimant's OCD did not meet the duration requirement, it is non-severe.

AR 14.  The ALJ then recounted Dr. Shertock's June 2011examination of Plaintiff and rejected her diagnosis and GAF assessment because they were based on Plaintiff's assertions and internally inconsistent.  The ALJ also recounted Dr. Hernandez's examination of Plaintiff and gave the opinion reduced weight because, according to the ALJ, Dr. Hernandez examined Plaintiff only once, the opinions relied extensively on Plaintiff's assertions, and the opinions, like Dr. Shertock's are internally inconsistent.  Finally, the ALJ discussed how the mental impairments caused only mild limitations to Plaintiff's four broad functional areas—activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation—which must be considered in evaluating mental disorders.  AR 15-16.

As a preliminary matter, the Commissioner's initial assertion is misplaced to the extent that Plaintiff is specifically disputing the ALJ's failure to find the mental impairments severe, and not that he failed to carry out step two of the disability determination.  Nevertheless, the Court finds Plaintiff's contention unavailing.  First, the ALJ's rationales, for the most part, are substantially supported by the record.  The record does not reflect Plaintiff consistently denied antidepressant medications or that he missed as many appointments as he attended with Dr. Van Laar.  It does, however, show Plaintiff testified to stopping antidepressants in 2008; contradicted himself with regard to being admitted to the emergency department after a suicide attempt—he was admitted after

16

an episode of alcohol abuse and overdose—and lied about being held over for two days for

observation; and reported improvements after his sessions with Dr. Van Laar and overall

improvements in April 2012.

The ALJ's decision to reject Dr. Shertock's diagnosis and GAF assessment also finds

substantial support in the record.  The ALJ noted that Plaintiff "never" reported experiencing

hallucinations and illusions to his treating psychiatrist at the time.[7]  AR 15.

Plaintiff presents no evidence to the contrary.  That his wife reported Plaintiff had a history of

suicide ideation and that the attending physician assessed Plaintiff with "suicide ideation" does not

belie the ALJ's reasoning.  The wife's statement and the attending physician's assessment stemmed

from Plaintiff's admission to the emergency department in May 2010 from alcohol abuse and

overdose.  Their statements are therefore not reliable indicators of any psychotic symptoms, which

is further diminished by the fact that Plaintiff subsequently denied trying to hurt himself.  He also

denied suicidal ideations when examined by Dr. Hernandez.  Further, the ALJ explained that

Plaintiff's cognitive test results did not support a finding of moderate limitations in concentration,

persistence, and pace.  Indeed, Plaintiff's mental status examination was overall unremarkable and

generally normal.  The conclusion, then, that he had moderate limitations in the areas of

concentration appeared questionable, and the ALJ could reasonably infer such.  *See*

*Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (an ALJ "is entitled to draw inferences

logically flowing from the evidence") (citations omitted).

The ALJ's decision to give reduced weight to the opinions of Dr. Hernandez is likewise

substantially supported by the record.  After recounting the opinions at length, the ALJ concluded

they "relie[d] extensively on representations made by [Plaintiff], whose allegations . . . are not

entirely credible.  Additionally, [the] Medical Source Statement (MSS) questionnaires are

inconsistent."  AR 16.  Indeed, the conclusion that Dr. Hernandez's opinions, based on a one-time

---

[7]  In September 2010, Plaintiff complained of hallucinations to the attending physician, a review of his systems show he was "[n]egative for depression and hallucinations."  AR 615.

examination, relied extensively on Plaintiff's representations is not without support.   While test results showed no cognitive or intellectual decrements, no present loss of contact with reality, and no formal thought disorder, Dr. Hernandez nonetheless diagnosed Plaintiff with psychological factors associated with a pain disorder.  A review of the examination showed that, like Dr. Shertock's, the results therein did not support Dr. Hernandez's diagnosis.  And to the extent Dr. Hernandez relied on Plaintiff's subjective complaints, the ALJ has properly found Plaintiff not entirely credible, *supra*. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999) ("A physician's opinion of disability premised to a large extent upon the claimant's own accounts of his symptoms and limitations may be disregarded where those complaints have been properly discounted.") (internal quotations and citations omitted).  Further, the inconsistent findings among the three questionnaires, all completed on the same day and sans analysis, also undermined Dr. Hernandez's opinions.  *Cf.* 20 C.F.R. § 16.1927(d) (2011) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.")

The ALJ therefore did not err in finding that Plaintiff's mental impairments were not severe.

3.   RFC Determination

Finally, Plaintiff contends that in making the RFC determination, ALJ failed to account for the mental impairments—depression, anxiety, and OCD—and improperly declined to adopt the opinions of Dr. Fine.  Doc. 18.  The Commissioner avers substantial evidence supports the ALJ's RFC findings.  Doc. 19.

a.   *Psychiatric Impairments*

Social Security Ruling 96-8p states in relevant part: "In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p.  And the Ninth Circuit has made clear that "[i]n crafting an RFC

determination, an ALJ "must only include those limitations supported by substantial evidence."

*Elletson v. Astrue*, 319 F. App'x 621, 623 (9th Cir. 2009) (internal quotations and citation omitted).[8]

A strict reading of the ALJ's decision shows he did not explicitly assess the mental impairments

(though non-severe) in determining Plaintiff's ultimate RFC.  But any error here was harmless

because the objective evidence supporting the mental impairments—the opinions of Drs. Shertock

and Hernandez—were properly rejected by the ALJ, *supra*.

> b.  *Dr. Frank Fine*

After recounting Dr. Fine's physical RFC questionnaire and written report, the ALJ

concluded in relevant part:

> Dr. Fine only examined the claimant once and does not treat him. . . .
> His opinion statements are somewhat contradictory with regard to
> limitations, but more importantly they are inconsistent with the record
> as a whole including abilities the claimant admitted under oath.
> Additionally, Dr. Fine's observation that the half-inch discrepancy in
> the claimant's calf circumference is indicative of significant atrophy is
> somewhat suspect given the level of claimant's physical activities
> throughout 2012 and the fact that atrophy was never noted in any of
> the claimant's physical therapy consultations or regular doctor's visits.

AR 23.  The record indeed supports the ALJ's conclusions.

Dr. Fine's opinions are inconsistent internally and with Plaintiff's own testimony at the

hearing, namely with regard to the weight he could lift, and how long he could stand and/or walk.

On the whole, the activities which Plaintiff testified he engaged in—attending church, driving, and

attending his children's baseball games—tended to undermine the restrictive limitations opined by

Dr. Fine.  And based on the 2012 medical records, which illustrated Plaintiff leading a more

physically actively lifestyle—for example, using the elliptical machine multiple times a week,

walking his dog for a mile almost daily, managing his sons' baseball team and his daughter's softball

team, getting out of the house Monday through Friday, grocery shopping, and doing household

---

[8]  This unpublished decision is citable under Rule 32.1 of the Federal Rules of Appellate Procedure.
*See also* 9th Cir. R. 36–3(b).

errands—it was not unreasonable for the ALJ to infer that a finding of atrophy seemed suspect. Despite asserting the ALJ implied "a falsehood" by rejecting Dr. Fine's opinion and that atrophy was present, Plaintiff points to no evidence aside from Dr. Fine's opinion.  As such, the ALJ did not err in declining to give deference to Dr. Fine's opinions and in not adopt them in the ultimate RFC findings.

## III.  CONCLUSION

Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner.  The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff, Michael Villavicencio.

IT IS SO ORDERED.

Dated:   __November 2, 2016__            _____/s/ Sandra M. Snyder___
                                         UNITED STATES MAGISTRATE JUDGE